UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DAEWOO INTERNATIONAL CORPORATION | CIVIL ACTION |
| VERSUS | NUMBER: |
| AMERICA METALS TRADING LLP, CIA SIDERURGICA DO PARA (COSIPAR), AND MINERACAO CARAJAS | SECTION: |
| | JUDGE: |
| | MAGISTRATE: |

## VERIFIED COMPLAINT

Plaintiff Daewoo International Corporation ("Daewoo"), by its attorneys Phelps, Dunbar LLP, for its petition against America Metals Trading LLP ("AMT"), Cia Siderurgica do Para (COSIPAR) ("Cosipar"), and Mineracao Carajas ("Mineracao") alleges upon information and belief as follows:

## NATURE OF THE PROCEEDING

1. This petition and the related arbitration arise out of AMT's breach of a series of agreements entered into between Daewoo and AMT during the period from May to October 2012 (collectively, the "Agreement") under which AMT was obligated to deliver substantial quantities of pig iron to Daewoo.

2. Pursuant to the Agreements, Daewoo has paid AMT nearly $14.5 million. To date, AMT has delivered nothing in return for these payments, and Daewoo's efforts to persuade AMT to perform have all proved futile.

## JURISDICTION AND VENUE

3. This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This court has admiralty jurisdiction

under 28 U.S.C. § 1333. The matter is instituted in accordance with the provisions of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims in order to obtain security and jurisdiction.

4. Venue is proper in the Court in accordance with the provisions of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, as defendants ATM, Cosipar and Mineracao have, upon information and belief, property in this district in the form of pig iron cargo located aboard the vessel M/V CLIPPER KASASHIO (IMO No. 9370135) which is presently maneuvering upbound in the Mississippi River toward a berth in the jurisdiction of this Honorable Court.

## THE PARTIES

5. Daewoo is a trading company incorporated under the laws of Korea with its principal place of business in Seoul, Korea.

6. At all material times, AMT was and is a limited liability partnership existing under the laws of England, with a principal place of business at 7 Welbeck Street, London, United Kingdom, having no office or place of business within this judicial district.

7. At all material times, defendant Cosipar was and now is a corporation or other business existing under the laws of Brazil, having no office or place of business within this judicial district.

8. At all material times, defendant Mineracao Carajas was and now is a corporation or other business existing under the laws of Brazil, having no office or place of business within this judicial district.

9. AMT is in the business of trading pig iron manufactured by Cia Siderurgica do Para (Cosipar), another company controlled by the same Monteiro family. Both AMT and Cosipar are 100% owned by Grupo Costa Monteiro, the Monteiro family's corporate entity. Grupo Costa Monteiro owns several different entities. Not only is it one of the largest integrated pig iron producers in Brazil, but it also has interests in mining, trading, and logistics. Cosipar and AMT share two Monteiro family members (Luis Claudio Mariano Monteiro and Luis Guiherme Mariano Monteiro) as their respective directors/principals.

10. AMT maintains accounts in New York banks, including the following:

- Bank of America, New York City, ABA 0260-0953-3, SWIFT CODE: BOFAUS3N, Account No. 580.1001.339.

11. AMT also maintains an account in ABN AMRO Bank NV in Rotterdam, The Netherlands, (swift code: FTSBNL2R), and has the following New York correspondent bank account:

- Deutsche Bank Trust, New York City, ABA 021001033, Account No. 24.22.53.946, IBAN NL07FTS0242253946, AMT as beneficiary.

12. Mineracao is in the business of mining, and its only involvement in this case is to act as the agent of AMT and Cosipar to assist in moving their pig iron cargo, which has now become the subject of maritime attachments due to AMT and Cosipar's failure to honor its contracts.

13. Through commercial sources, Daewoo learned that AMT and Cosipar caused a cargo of 9,000 MT of pig iron to be placed onboard M/V CLIPPER KASASHIO for discharge in New Orleans. The cargo's bills of lading were placed in Mineracao's name to avoid the attention of AMT's creditors such as Daewoo. However, possession

and control of the cargo remains with AMT and Cosipar either directly or through Mineracao, acting as the agent of AMT and Cosipar.

### In the alternative, Alter Ego Allegations

14. The factual recitations above concerning ownership and control of the pig iron cargo onboard CLIPPER KASASHIO should be sufficient to subject the cargo to Rule B attachment. However, to the extent that this Honorable Court determines that now, or after contradictory proceeding, the cargo is owned or controlled by the mining company Mineracao, Daewoo hereby makes the following alter ego allegations.

15. AMT, Cosipar and Mineracao are owned and/or controlled by the Monteiro family.

16. Upon information and belief, defendants are commonly controlled entities and, at all relevant times held, and continue to hold themselves out to the world as being associated companies and are recognized as such within the maritime and shipping community.

17. Upon information and belief, the defendants share officers, directors, and personnel.

18. Upon information and belief, the defendants share common offices and addresses.

19. Upon information and belief, the defendants regularly intermingle or commingle funds and interchangeably pay each other's debts.

20. Upon information and belief, defendants' common officers exercise such complete domination and control over the other defendants and/or disregard the other defendants' corporate forms and/or conduct the business and operations of the other

4

defendants as if the same were the common officers' own, and vice versa, such that adherence to the fiction of the separate existence of the defendants as entities distinct from one another would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

A. <u>The Transaction at Issue</u>

21.     On or about May 29, 2012, Daewoo entered into a commercial transaction with AMT for the purchase of 5,200 metric tons of pig iron (the "Material") manufactured by Cosipar, AMT's sole manufacturer and a company, which, as noted, like AMT, is controlled by the Monteiro family. As part of the transaction, Daewoo and AMT entered into a total of twenty agreements. The Agreements contemplated that Daewoo would resell the Material through its affiliate, Daewoo International America, to different end-buyers located in the United States and other countries, with delivery to Daewoo to be made in New Orleans.

22.     Under the Agreements, upon presentation of a Forward Certificate Receipt, Daewoo was to "pay AMT 85% of the value of the Material" as the First Provisional Payment. The Forward Certificate Receipt was required to state that the Material had been delivered and stored as Daewoo's property.

23.     Once Daewoo made the First Provisional Payment, AMT, as seller, was to deliver the Material by the shipment date stated in each of the Agreements. Specifically, the Agreements provided in relevant part:

> 4.     TERMS OF DELIVERY
>
> C)     In no event shall Seller delay or refuse the delivery of Material under the Agreement by reason of imposition or increase of tax, or increase of Material, difficulty of supply of Material or any other change in the economic circumstances.

5

    Any breach of this clause 4.0 constitutes a Material breach of the Agreement.

24. Article 5 of the Agreements, entitled "Schedule Time of Shipment," further provided, inter alia: "(A) Time for delivery shall be of the essence and must be strictly adhered to. Material must be delivered not later than the required Delivery Date. If Seller for any reason shall refuse or fail to make shipments in compliance with the Delivery Date, Buyer, in addition to any other rights it may have, may cancel the whole or in part of the order without any liability on the part of Buyer and is entitled to compensation from Seller for any losses and damages suffered by Buyer due to such default."

25. AMT also agreed that the risk of loss and damage would lie with it until the Material was unloaded at the port of destination, but that title would pass from AMT to Daewoo upon Daewoo's receipt of the Forward Certificate Receipt. Specifically, Article 9 of the Agreements provided:

    9. Risk of loss and title:

    A) Risk of loss and damage shall pass from Seller to Buyer at the time Material is unloaded at the Destination.

    B) The title of the relevant Material shall pass from Seller to Buyer upon Buyer's receipt of [Forward Certificate Receipt].

26. Under Article 9 of the Agreements, Daewoo became the owner of the Material once it (a) was presented with the Forward Certificate Receipt and (b) made the First Provisional Payment due under the Agreements.

27. AMT further agreed that liquidated damages would be due if it failed to ship the Material to Daewoo by the stated shipment date in each Agreement. Thus, Article 14 of the Agreements provides that, "[i]n the event of Non-shipment by the stated

6

date," Daewoo could recover "100% of the 1st Provisional Payment + Interest rate of annum 5.5%" to Daewoo.

28. The Agreements are governed by New York law and contain an arbitration clause under which "any controversy or claim arising out of or relating to the Agreement[s], or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association (the "AAA") under the Commercial Arbitration Rules in New York, USA, and judgment of the award rendered by the arbitrators may be entered in any court having jurisdiction thereof."

### B. Daewoo Paid Nearly $14.5 million In Advance Payments, But Never Received Any Goods In Return For These Payments

29. In accordance with the terms of the Agreements, Daewoo made the required First Provisional Payments totaling an aggregate of US $14,479,638.87, which represented 85% of the value of the Material. Specifically, between June and October 2012, Daewoo wired each of the First Provisional Payments to ABN AMRO Bank NV in Rotterdam, The Netherlands (swift code: FTSBNL2R) ("ABN AMRO"), through a U.S. corresponding bank at Deutsche Bank Trust (ABA 021001033) in New York City, with AMT as beneficiary of account number 224.22.53.946 IBAN NL 07FTS024225396.

30. Although Daewoo was presented with Forward Certificate Receipts stating that the Material had been delivered by AMT and Cosipar, and the First Provisional Payment was made to AMT, ATM failed to deliver any of the Material for which Daewoo paid it the sum of US $14,479,638.87. Daewoo thus owns US $14,479,638.87 of Material which it never received and for which ATM has been paid.

C. <u>AMT Has Failed to Deliver the Goods</u>

31.  Despite repeated requests by Daewoo — and continued promises to deliver by AMT and Cosipar — AMT has failed to deliver the Material it owes Daewoo under the Agreements.

32.  In fact, it has become clear that, despite assuring Daewoo of their intent to comply with their obligation to deliver the Material pursuant to the Agreements, AMT and Cosipar have taken numerous affirmative steps to avoid delivering the cargo to Daewoo and to cover up their fraudulent actions.

33.  In an effort to hide their illicit transactions, Daewoo believes that AMT and Cosipar arranged for the forwarder, yet another company controlled by the Costa Monteiro family, to issue a sham Forward Certificate Receipt to Daewoo.

34.  As Daewoo later discovered, AMT and Cosipar did not ship the Material to New Orleans, Louisiana, USA — the agreed-upon port of destination. Rather, investigation by Daewoo in Brazil has revealed that AMT and Cosipar initially transferred cargoes belonging to Daewoo to different locations. Since around November 12, 2012, the location of Material has been unknown to Daewoo, and all reasonable efforts by Daewoo to ascertain the current location of the Material or inventory have failed.

35.  Not surprisingly, multiple attempts to ascertain the status of the shipment and location of the cargoes from AMT and Cosipar have yielded no reliable information. For example, until early November 2012, Luis Eduardo, director of both AMT and Cosipar, repeatedly assured Daewoo that AMT and Cosipar were trying to find

measures to ship the Material. Based on Daewoo's independent investigation, however, these assurances appear to be false.

36. No less disturbing to Daewoo was the fact that, despite e-mail correspondence from AMT/Cosipar stating that the Material was located in a shipyard operated by Vale in Maraba, Brazil, and that AMT and Cosipar were working to have the Material delivered to Daewoo on November 9, 2012, Daewoo's investigation found that there were no cargoes in the name of Cosipar at the Vale yards.

D.  AMT is in Dire Financial State and Dissipating Assets

37. Starting in or about November 2012, several entities, including Brazil's Ministry of Labor, Brazil's ABN AMRO, and international shipping company Thyssen Krup, have all brought separate lawsuits against AMT and sought to attach assets of AMT and Cosipar in Brazil, upon information and belief, for reasons including AMT's failure and refusal to pay its employees and to deliver goods to buyers. Upon further information and belief, the Material that was supposed to be delivered to Daewoo has already been attached by these entities.

38. Further, on or about November 2, 2012, Daewoo was contacted by a representative of ABN AMRO regarding shipments that had been financed by the bank and are pending payment. However, a comparison of the documents AMT provided to ABN AMRO and to Daewoo revealed that some of the documents AMT submitted to the bank appear to be fraudulent.

39. As Daewoo's investigation further revealed, as of November 1, 2012, Cosipar suspended the manufacture of pig iron in Brazil and let most of its employees

9

go. Since virtually all of AMT's business consisted of trading pig iron manufactured by Cosipar, AMT no longer appears to have any active business.

40.     AMT has failed to make shipments to other buyers. For example, on or about October 5, 2012, Stemcor USA Inc., a U.S. trading company located in New York City, filed a complaint against AMT in the U.S. District Court for the Eastern District of Louisiana, alleging that AMT failed to deliver cargoes and seeking maritime attachment against certain cargo. See <u>Stemcor USA Inc. v. America Metals Trading LLP & Cia Siderurgica do Para (COSIPAR)</u>, Case No: 2:12-cv-02460). The Honorable Judge Zainey issued a Rule B attachment order in that case before it was transferred to the Honorable Judge Berrigan.  The attachment was then served on a cargo of pig iron onboard M/V UBC SANTOS.

41.     Based on the foregoing facts revealed through Daewoo's business experience and investigation, Daewoo brought suit in New York state court on December 4, 2012 seeking a state law attachment and garnishment of defendant's assets in that jurisdiction as security for Daewoo's arbitration claims.

E.   <u>The Underlying Arbitration Proceeding</u>

42.     As described above, Daewoo and AMT agreed to submit all disputes arising out of the Agreements to arbitration in New York before the American Arbitration Association pursuant to its Commercial Rules.

43.     There is no question that Daewoo has a viable cause of action against AMT for breach of the Agreements. The Agreements between AMT and Daewoo are valid and binding. Documentary evidence establishes that Daewoo fully performed, making advance payments to AMT equal to 85% of the value of the Material. AMT itself

10

has conceded that Daewoo did everything it was required to do. Nor can there be any doubt that AMT has breached the Agreements by failing to deliver the Material. Indeed, AMT has never even tried to contend otherwise.

44. AMT's past dishonest conduct, including intentionally diverting and misappropriating the cargoes belonging to Daewoo and its subsequent attempts to cover up its fraudulent acts, suggest there is a strong likelihood that AMT has dissipated the monies Daewoo wired to AMT's accounts or is about to remove assets belonging to Daewoo and convey them to other entities, including Cosipar (the manufacturer which is also controlled by the Monteiro family), before Daewoo can enforce its eventual arbitration award.

45. As such, without an order of attachment, the arbitration award that will likely be granted in Daewoo's favor will be rendered ineffectual. Daewoo thus seeks an order of attachment to secure its arbitration award in the total sum of $15,496,493.60, calculated as follows:

- Amount Daewoo wire-transferred to AMT = $14,479,638.87
- 5.5% per annum agreed-upon liquidated damages = $278,545.51
SUBTOTAL $14,758,184.38

- Poundage fees (5% of subtotal) $ 737,909.22
- Court fees         300.00
- Sheriffs levy fee 100.00

TOTAL      $15,496,493.60

### Arbitration

46. Pursuant to the terms of each agreement, plaintiff's claims are subject to arbitration in New York.

11

47.     In accordance with 9 U.S.C. § 8, plaintiff is entitled to obtain pre-judgment security for its claims by way of a maritime attachment under Rule B.  Plaintiff reserves the right to arbitrate the merits of the dispute.

### Writ of Maritime Attachment

48.     Plaintiff incorporates by reference all of the allegations alleged in paragraphs 1-47, *supra*.

49.     Defendants have breached the aforesaid agreements as described above.

50.     Plaintiff avers upon information and belief that defendants cannot be found within the district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

51.     However, upon information and belief received from local vessel agents in Brazil, plaintiff submits that both Cosipar and AMT will have goods and chattels within this district subject to attachment including, but not limited to, a cargo of 9,000 metric tons of pig iron aboard the vessel CLIPPER KASASHIO (the "Cargo"), which upon information and belief, is located within this District.

**WHEREFORE**, Plaintiff prays:

A.      That process in due form of law and according to the rules and practices of this Honorable Court in causes of admiralty and maritime jurisdiction may issue against the aforementioned Cargo, and that all persons claiming any title or right to said Cargo may be cited to appear and answer under oath the allegations of this Verified Complaint;

B.      That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and

Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of Defendants' tangible or intangible property or any other funds in the district which are due and owing or otherwise the property of to the Defendants, including the Cargo referenced above aboard the CLIPPER KASASHIO, up to the amount of $15,496,493.60 to secure the Plaintiff's claims, as best as can be presently ascertained, together with interest, costs, attorney's fees, all other costs of this action, including Marshal's fees and expenses, and any required storage costs;

  C. That the Cargo be attached forthwith, pursuant to Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims and Federal Rules of Civil Procedure for writ of foreign attachment in the amount of $15,496,493.60, as best as can be presently ascertained, all pursuant to a writ of foreign attachment as authorized or permitted by the Federal Rules of Civil Procedure, and

  D. That Plaintiff have such other and further relief as justice may require.

Respectfully submitted,

**PHELPS DUNBAR LLP**



---
Robert J. Barbier (#2741)
Raymond T. Waid (#31351)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
Attorneys for Plaintiff, Daewoo International Corporation

**LEE & KO**
June Junghye Yeum
18th Floor, Hanjin Main Building
118, Namdaemunno 2-ga, Jung-gu
Seoul, Korea 100-770
Telephone: 82.2.772.4000
Telecopier: 82.2.772.4001
Direct: 82.2.2191.3234
june.yeum@leeko.com
Attorneys for Petitioner, Daewoo International Corporation

## VERIFICATION

SEOUL SPECIAL CITY

REPUBLIC OF KOREA

Keun Tae Kim, a/k/a Daniel Kim, being duly sworn, deposes and says:

I am a trader in Raw Materials Team 1, Steel Raw Materials Division, and employed by the petitioner Daewoo International Corporation in this proceeding. I have read the foregoing Petition and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

Pursuant to 28 USC § 1746, I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 14 December, 2012.

_____
Keun Tae Kim